**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

_____
)
DAVID DAOUD WRIGHT,                    )
                                       )
            Plaintiff,                 )
                                       )
                                       )    Civil Action No. 21-CV-11428-AK
v.                                     )
                                       )
DOUGLAS DEMOURA, MARC DUBOIS, )
and JODI HOCKERT-LOTS                  )
                                       )
            Defendants.                )
_____)

<u>**MEMORANDUM AND ORDER ON DEFENDANTS'**
**MOTION FOR SUMMARY JUDGMENT**</u>

**ANGEL KELLEY, D.J.**

David Daoud Wright ("Plaintiff" or "Wright"), proceeding *pro se*, brings this Section

1983 action concerning the approximately 18 days he did not receive halal meals while detained

at the Massachusetts Correctional Institute at Cedar Junction ("MCI-CJ").  Wright asserts two

claims under the First Amendment and one claim under the Fourteenth Amendment.

Specifically, Wright alleges that Defendants Douglas W. DeMoura, Marc DuBois, and Jodi

Hockert-Lots (collectively, "the Defendants") violated his First and Fourteenth Amendment

rights by withholding the halal meals, retaliating against him for refusing non-halal meals, and

infringing on his due process rights by placing him in the Limited Privileges Unit ("LPU").

Defendants have moved for summary judgment on all counts.  For the following reasons,

Defendants' Motion for Summary Judgment [Dkt. 162] is **GRANTED**.

## I.    BACKGROUND

In evaluating the Motion for Summary Judgment, the Court relies on the parties' statements of material facts, responses thereto, and any attached exhibits.  [See Dkts. 163, 164, 178, 179, and 185].  The Court accepts as true each material fact that has not been disputed by the opposing party and considers contested every material fact that has been disputed.  Consistent with the summary judgment standard, this Court canvasses material facts in a light that flatters, but does not distort, the Plaintiff's claims.  Martinez v. Colon, 54 F.3d 980, 982 (1st Cir. 1995).

Wright was incarcerated at MCI-CJ in Walpole, Massachusetts, from June 14, 2021 - September 24, 2021.  Defendant Douglas DeMoura was a superintendent of MCI-CJ; Defendant Jodi Hockert-Lotz was Deputy Superintendent of Reentry; and Defendant Marc DuBois was the Chief of Inner Perimeter Security ("IPS").  During his initial intake, Wright was asked about his religion but not about his diet.  Wright's data on MCI-CJ's system indicates that "other" was selected on June 16, 2021, and "Islam" was selected on July 8, 2021.  [Dkt. 163-2].  On June 14, 2021, Wright requested a halal diet from medical staff.  At MCI-CJ, a halal diet is designated as a religious diet.[1]  Defendants assert that medical staff are not authorized to place inmates on religious diets.  [Dkt. 178 ¶ 9].

Wright was removed from the halal diet on June 19, 2021.  [Id. ¶ 10].  The parties dispute the reason for his removal: Defendants argue it resulted from a medical staff error, while Wright claims it was retaliation for filing grievances.  [Id. ¶ 10].  After his halal meals were discontinued, Wright continued to consume food from the trays and commissary items that were

---

[1] Under Islamic law, halal refers to the way meat is slaughtered.  It also refers to the way animals are treated before they are slaughtered.  What is considered halal is described in detail in the Quran, the book that guides Muslims. See QURAN, 2:173, 5:3, 6:145 and 16:115, https://quran.com/ (last visited Mar. 27, 2025).

consistent with his religious beliefs.  Wright also ate breakfast since it did not contain meat.  A

correction officer advised Wright that, in order to receive halal meals again, he must submit a

request to the Director of Treatment at MCI-CJ, Tammy Duarte ("Director Duarte").

On June 30, 2021, the IPS team at MCI-CJ was informed that everyone in Block 4, which

is where Wright was housed, refused to leave their cells to retrieve their meals.  This was the

fourth consecutive meal that the detainees in Block 4 refused to eat, thus, triggering the hunger

strike protocol.  The IPS team immediately conducted interviews with everyone in Block 4.  The

parties dispute why the detainees refused to eat.  Defendants state that, based on the interviews, it

was determined that the detainees refused to eat because they had issues with recreation, heat,

library access, and out of call time.  [Id. at ¶ 18].  Wright asserts that the refusal was motivated

by the lack of halal meals.  [Id.].  After a careful analysis of the record, the Court determines this

is not a material disputed fact.   Wright's assertion that he was complaining about the non-halal

meals does not contradict Defendants' account of the June 30th incident.

Defendants state that the interviews also revealed that the detainees believed they "have

to finish what the other two started."  [Dkt. 163-6].  Defendants believed many members of

Block 4 participated in the hunger strike because of Wright.  [Dkt. 163-7] ("Multiple inmates

within the unit expressed that plaintiff was behind the hunger strike.  Moreover, it was reported

that shortly after plaintiff was removed from the unit the remaining inmates accepted their

meals.").  Wright disputes he was an instigator and points to officers' notes collected on June 30,

2021, for support.  At 8:30 a.m. on June 30, 2021, Wright was transferred to the LPU, along with

the other identified instigator, Joel Polanco ("Polanco").  At 12:10 p.m., the notes indicate

everyone remaining in Block 4 refused to eat.  The Court understands this to mean that, after

Wright was escorted to the LPU, all members of Block 4 who remained still refused to eat.  [Dkt.

179-14].  Defendants did not provide any information after June 30, 2021, that indicate the remaining Block 4 members resumed eating following the lunchtime meal.

Wright states he did not have access to the commissary when he was in the LPU.  He believes he was placed in the LPU because he was filing grievances.  It is disputed how many grievances Wright filed.  Wright states he filed "a series of grievances" while Defendants maintain it was only three informal grievances.  [Dkt. 178 ¶ 31].  The record developed by both parties contains only three informal grievances.  The first informal grievance is dated July 6, 2021, which included a request for halal meals and a request to be transferred back to the Wyatt Detention Facility.  The second informal grievance is also dated July 6, 2021, and it included allegations of staff retaliation for refusing to eat non-halal meals and his placement into the LPU.  The third informal grievance is dated July 27, 2021, and it requested religious books.  [Dkt. 179-9].  According to the LPU manual, a detainee is required to complete an informal grievance or complaint before filing a formal grievance.  [Dkt. 179-19 at 14].  The informal grievance can be appealed by filing a formal grievance.  [Id.].  The record does not contain any evidence of any formal grievances filed by Wright.

On July 8, 2021, Wright completed the Special Diet Request Form.  While in the LPU, Wright met with an imam and answered sincerity questions about his religion.  Director Duarte placed Wright on a halal diet on July 8, 2021, the same day she received the Special Diet Request Form.  Wright began receiving halal meals on or around July 9, 2021.  Wright was transferred from the LPU back to Block 4 on July 12, 2021.  [Dkt. 178 ¶ 42].  On September 24, 2021, Wright was transferred to the federal prison facility in Terre Haute, Indiana.  He continued to receive halal meals from July 9, 2021, until his transfer to Indiana.  [Id.].

## II.    PROCEDURAL HISTORY

Wright filed this suit on August 27, 2021.  On January 17, 2023, he moved to dismiss his Religious Land Use and Institutionalized Persons Act claim, which the Court granted on January 18, 2023.  [Dkts. 67, 70].  Following a nearly two-year discovery period, Defendants filed a Motion for Summary Judgment on May 24, 2024, on all remaining claims.  Wright has been proceeding pro se throughout this litigation.

## III.    LEGAL STANDARD

The purpose of summary judgment is to "'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'"  Mesnick v. Gen. Elec. Co., 950 F.2d 816, 822 (1st Cir. 1991) (citing Garside v. Osco Drug, Inc., 895 F.2d 46, 50 (1st Cir. 1990)).  Summary judgment may be granted when the record, viewed in the light most favorable to the non-moving party, presents no "genuine issue of material fact," and the moving party is entitled to judgment as a matter of law.  Paul v. Murphy, 948 F.3d 42, 49 (1st Cir. 2020).  The Court must determine (1) whether a factual dispute exists; (2) whether the factual dispute is "genuine," such that a "reasonable fact-finder could return a verdict for the nonmoving party on the basis of the evidence"; and (3) whether a fact genuinely in dispute is material.  Scott v. Sulzer Carbomedics, Inc., 141 F. Supp. 2d 154, 170 (D. Mass. 2001).  A "material" fact is one that "has the potential to change the outcome of the suit under the governing law if the dispute over it is resolved favorably to the nonmovant."  Navarro v. Pfizer Corp., 261 F.3d 90, 93-94 (1st Cir. 2001) (internal citation and quotations omitted).  Similarly, a "genuine" dispute indicates "the

evidence about the fact is such that a reasonable jury could resolve the point in favor of the nonmoving party." Id.

Courts must evaluate "the record and [draw] all reasonable inferences therefrom in the light most favorable to the non-moving parties." Est. of Hevia v. Portrio Corp., 602 F.3d 34, 40 (1st Cir. 2010) (citing Houlton Citizens' Coal. v. Town of Houlton, 175 F.3d 178, 183-84 (1st Cir. 1999)). A non-moving party may "defeat a summary judgment motion by demonstrating, through submissions of evidentiary quality, that a trialworthy issue persists." Paul, 948 F.3d at 49 (citation omitted). Only disputed facts that have "the potential to change the outcome of the suit" necessitate a trial. Parrilla-Burgos v. Hernandez-Rivera, 108 F.3d 445, 448 (1st Cir. 1997) (citation omitted).

## IV.    DISCUSSION

Title 42 U.S.C. § 1983 "provides a federal cause of action against any person who, acting under color of state law, deprives another of his federal rights." Conn v. Gabbert, 526 U.S. 286, 290 (1999). In other words, Section 1983 is the proper vehicle to assert constitutional violations against state officials. See Gregson v. Rhode Island Dep't of Corr., 2025 WL 579615, at *3 (D.R.I. Feb. 21, 2025). To maintain a claim under Section 1983, a plaintiff must establish (1) that the defendant acted under color of state law; and (2) that their conduct deprived the plaintiff of rights secured by the Constitution or by federal law. Gagliardi v. Sullivan, 513 F.3d 301, 306 (1st Cir. 2008). It is well-established "that the liability of persons sued in their individual capacities under section 1983 must be gauged in terms of their own actions." Rogan v. Menino, 175 F.3d 75, 77 (1st Cir. 1999). This requires defendants set in motion a series of acts by others which the defendants knew or reasonably should have known would cause others to inflict the constitutional injury. Wright v. Moniz, 737 F. Supp. 3d 48, 60 (D. Mass. 2024). Additionally,

claims against state officials in their individual capacities under Section 1983 are subject to the doctrine of qualified immunity.  See Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).  Wright concedes that he is suing the Defendants in their individual capacities.  [Dkt. 177] ("Thus, where the FAC amply establishes individual liability and Mr. Wright has not sued the Department of Correction (DOC) and the defendants assert qualified immunity, they are sued individually under 42 U.S.C. § 1983.").

Construing the Amended Complaint liberally, Wright brings three claims against the Defendants through Section 1983.  First, Wright alleges the individual Defendants violated his First Amendment rights by refusing to provide him with halal meals.  Second, Wright alleges the Defendants violated his First Amendment rights by retaliating against him by placing him in the LPU.  Lastly, Wright alleges that Defendants violated his Fourteenth Amendment right to procedural due process when they placed him in the LPU.  This Court discusses each claim in turn.

### A.    Free Exercise Clause under the First Amendment

Prisoners retain certain protections afforded by the First Amendment, including the free exercise of religion.  Denson v. Marshall, 44 F. Supp. 2d 400, 402 (D. Mass. 1999), aff'd, 230 F.3d 1347 (1st Cir. 2000).  Prisoners do not, however, enjoy all the protections afforded by the Constitution.  Dooley v. Quick, 598 F. Supp. 607, 613 (D.R.I. 1984), aff'd, 787 F.2d 579 (1st Cir. 1986) ("Imprisonment carries with it the circumscription or loss of many significant rights.").  Consequently, a prisoner's right to freely exercise his or her sincerely held beliefs "is necessarily limited by the fact of incarceration, and may be curtailed in order to achieve legitimate correctional goals."  Campbell v. Cornell Corr. of Rhode Island, Inc., 564 F. Supp. 2d 99, 103 (D.R.I. 2008).  A regulation or policy that burdens the First Amendment right to free exercise

may be upheld only if it is "reasonably related to a legitimate penological interest."  Turner v. Safley, 482 U.S. 78, 89 (1987).  Courts consider four factors, called the "Turner factors," when determining whether a regulation is reasonably related to a legitimate penological interest: (1) whether there is a valid, rational connection between the regulation and the legitimate government interest; (2) whether there are alternative means of exercising the right that remain open to inmates; (3) the impact that accommodation of the right will have on guards, other inmates, and the allocation of prison resources; and (4) the absence of ready alternatives. Kuperman v. Wrenn, 645 F.3d 69, 74 (1st Cir. 2011) (summarizing factors described in Turner, 482 U.S. 78).  Although the Amended Complaint does not clearly specify what policies, regulations, or conduct allegedly to have violated the Free Exercise Clause, the Court will consider the policy regarding halal meal requests as the crux of the issue.

It is undisputed that Wright did not receive a halal meal for approximately 18 days. Wright received halal meals because a medical staff member ordered it upon his arrival on June 14, 2021.  However, according to the Defendants, this meal designation was erroneous because medical staff can only authorize medical or therapeutic meals, and a halal diet is neither.  Wright was removed from the halal diet plan on June 19, 2021, after prison officials identified the mistake.  Wright does not dispute that he was told he needed to complete the Special Diet Request Form in order to receive the halal meals again.  Following an unexplained delay, Wright finally completed the form and sent it to the Director of Treatment on July 8, 2021.  Wright was placed back on the halal meal plan on the same day.

Wright argues that the Defendants were made aware of his religious diet requirements before he even arrived at MCI-CJ and then again once he arrived.  [See Dkt. 187 at 4].  However, this argument misses the mark for several reasons.  First, there is no evidence to indicate that

information is systemically shared among prisons when detainees are transferred.  The fact that Wright underwent a medical examination and completed an initial intake upon arriving at MCI-CJ suggests that each facility operates independently.   Second, during the initial intake, the officer inquired only about Wright's religion, and "other" was noted.  [Dkt 163-2].  This was subsequently changed to "Muslim" on July 8, 2021, but this designation does not necessarily correlate with his dietary restrictions, as not all Muslims adhere to a halal diet.[2]  To assume otherwise would infringe upon the rights of Muslim detainees who choose *not* to eat halal meals. Lastly, MCI-CJ's procedure for requesting halal meals, pursuant to 103 CMR, is clear:

> Inmates whose religion places restrictions on diets should be permitted access to a special religious diet. However, in limited situations where the institution/Department is not able to meet all aspects of a special religious diet request due to security and/or facility limitations, the institution shall make every effort to provide a reasonable accommodation to the diet request. *Requests for special religious diets shall be initiated by interested inmates, using the Special Diet Request Form, which is available in all inmate libraries.* (emphasis added).

[Dkt. 163-3].

The fact that Wright initially received halal meals due to the medical staff's designation does not invalidate the established procedure that governs this process.  Regardless of what the medical staff ordered, Wright was still required to complete and submit the Special Diet Request Form.  The process to obtain approval is not an arduous one, as evidenced by the fact that Wright received the halal meals the same day (or the day after) the Director received his Special Diet Request Form.

---

[2] The Court takes judicial notice of a debate among Muslim scholars on the permissibility of the consumption of non-halal meat in the United States.  See The Ambiguity of Meat in America–Comments from Scholars, Halal Food Standards Alliance of America (last visited March 27, 2025), https://www.hfsaa.org/the-ambiguity-of-meat-in-america-comments-from-scholars/.

Rules, like the one about religious diet accommodations request, must be enforced when they are rationally related to valid objectives of facility management and administration and intrusion on individual rights is minimal.  <u>Dooley</u>, 598 F. Supp. at 613.  Wright does not address the <u>Turner</u> factors.  Thus, this Court ends its analysis here.  The Court notes that institutionalizing a process to request a religious diet is reasonable, especially when the turnaround is immediate, as is the case here.  This arrangement is particularly justifiable when prison facilities must assess the sincerity of inmates' religious beliefs.  <u>Turner</u> instructs courts to apply a rational basis standard in reviewing prison policies to assess reasonableness.  See <u>O'Lone v. Est. of Shabazz</u>, 482 U.S. 342, 350 (1987) (applying the <u>Turner</u> factors to uphold a policy that was reasonable even though alternatives existed); <u>see also</u> <u>Yaacov v. Collins</u>, 649 F. Supp. 2d 679 (N.D. Ohio 2009) (collecting cases that apply Turner in upholding policies).  Where prison facilities are often inundated with accommodations requests, the Court finds that the process to request a religious diet, as described in 103 CMR 471, is rationally related to overall objectives of facility management and administration.  Furthermore, nothing in the record indicates the Defendants were involved in adopting the religious diet policy or were personally involved in enforcing it.  Thus, the Defendants are entitled to summary judgment on Wright's claim that his First Amendment rights were violated when the prison enforced its policy to request a special diet meal.

### B.    Retaliation under the First Amendment

Wright also brings a retaliation claim under the First Amendment.  Wright alleges that the individual Defendants retaliated against him for filing grievances and for failing to eat non-halal meals.  To the extent Wright is alleging the individual Defendants retaliated against him for filing grievances, that argument can be disposed of by examining the timeline of when the

grievances were filed.  All of Wright's informal grievances were filed after the halal meals were already discontinued.  While Wright indicates he filed a "series of grievances," there is no evidence of this.  Nor is his suggestion of spoliation of evidence compelling.  Without anchoring this contention to anything in the record, sending this issue to the jury "would amount to nothing more than an invitation to speculate." Tyree v. Foxx, 835 F.3d 35, 42 (1st Cir. 2016) (internal citation omitted).  Defendants, one the other hand, point to contemporaneous evidence— specifically an email from August 3, 2021—that supports their position that there were only three informal grievances.  [See Dkt. 163-4 at 10] ("Attached are the two informal complaints I received from Inmate Wright.  Both informals are dated 7/6/21 and were responded to on 7/8/21.  I have on additional informal that I received today regarding religious books he ordered but he has not yet received.").  Based on the credible evidence, the Court concludes there are no grievances dated before the halal meals were discontinued and there is no evidence of spoliation.  Thus**,** Wright cannot sustain a First Amendment retaliation claim under his grievances theory.  Wright's contention that he was placed in the LPU because of his refusal to eat non-halal meals, however, requires closer judicial scrutiny.  Yet, it too suffers the same fate.

The First Amendment guarantees freedom from retaliation on the basis of protected speech.  Hannon v. Beard, 645 F.3d 45, 48 (1st Cir. 2011) (holding that "retaliation against a prisoner's exercise of constitutional rights is actionable").  However, only actions "that would deter a similarly situated individual from exercising his or her constitutional rights constitutes an adverse action for a claim of retaliation.  Otherwise, the retaliatory act is simply *de minimis* and outside the ambit of constitutional protection."  Price v. Wall, 464 F. Supp. 2d 90, 96 (D.R.I. 2006) (emphasis in original).  Courts regard retaliation claims from incarcerated plaintiffs with skepticism given that these claims are "easily fabricated[ ] and . . . pose a substantial risk of

unwarranted judicial intrusion into matters of general prison administration[.]  [C]ourts must insist that such claims are bound up in facts, not in the gossamer strands of speculation and surmise." Hannon, 645 F.3d at 48 (internal quotations and citations omitted).  Otherwise, courts would find themselves "embroil[ed] [] in every disciplinary act that occurs in penal institutions." Price, 464 F. Supp. 2d at 96.  When faced with summary judgment on a retaliation claim, a detained plaintiff must make a showing of three elements: (1) that he or she engaged in a protected activity; (2) that the state took an adverse action against him or her; and (3) that there is a causal link between the former and the latter.  Hannon, 645 F.3d at 48-49.  Regarding causation, "a prisoner must prove that the [adverse] action would not have been taken 'but for' the alleged improper reason."  L'Heureux v. Whitman, 125 F.3d 841 (1st Cir. 1997).

### 1. Protected Activity

Wright has sufficiently made a showing that he suffered an adverse action by being placed in the LPU, but he has not made a sufficient showing that it was because he was engaging in a protected activity.  While filing grievances is a protected activity, see Hannon, 645 F.3d at 48, the record lacks any evidence (other than his own contention) that suggests Wright filed a grievance before the adverse action occurred.  In other words, all the informal grievances were filed after Plaintiff had already entered the LPU.  [Dkt. 179-9].  Thus, the only "protected activity" that can sustain a retaliation claim is Wright's refusal to eat non-halal meals due to his religion.  Still, this, too, is on shaky foundation.

Wright does not dispute that a hunger strike protocol was initiated after detainees in Block 4 refused to eat consecutive meals.  [Dkt. 178 ¶16].  It is not clear, however, if Wright participated in this hunger strike.  Defendants contend he did, while Wright maintains he did not. The Court finds this to be an immaterial distinction since officials at MCI-CJ reasonably

perceived him to be a participant.  Wright underwent a mental health evaluation "in response to hunger strike protocol."  [Dkt. 179-10).  An interview of other inmates revealed that Polanco, an alleged co-inciter of the hunger strike, "was mad that [another inmate] was the first inmate to accept a meal tray" during the hunger strike.  [Dkt. 179-13).  The June 30, 2021 notes indicate that all detainees of Block 4 were refusing meals.  [Dkt. 179-14).  A Climate Report from Sergeant Matthew Borges to Superintendent DeMoura (through IPS Commander DuBois) stated:

> On Wednesday, June 30, 2021 the IPS Team was informed that []
> all the detainees within the Block 4 Housing Unit did not come out
> of their cells to retrieve their afternoons meals.  This meal was the
> fourth consecutive meal that was missed by the detainees, which
> initiated the hunger strike protocol.  Subsequently the IPS Team
> reported to the Block 4 Housing Unit to conduct interviews.  The
> consensus amongst the detainees are issues with recreational time,
> the heat, library access, and the current out of cell time . . . .  It was
> also learned that "they (the detainees) have to finish what the other
> two started." *This is in reference to the two detainees that were
> previously identified as main instigators and removed from the
> Block 4 Housing Unit*.  (emphasis added).

[Dkt. 179-16].

An email on June 30, 2021 to the Marshals stated that Wright and another inmate were "the ring leaders in this demonstration; therefore, [they] have moved them to out LPU (restrictive housing unit).  The concerns noted were tier time, shower time, library as well as heat."  [Dkt. 163-4 at 13].  The gravamen of this contemporaneous evidence, compared to a dearth of evidence from Wright, indicates that a hunger strike was occurring and Wright was understood to be, at the very least, a participant in it by the other detainees and officials at MCI-CJ.  Thus, the question is whether this hunger strike is protected activity under the First Amendment.

As a sister court indicated, hunger strikes can be a protected activity if it was intended to convey a particularized message.  See Hatik v. Massachusetts, 2020 WL 4756457, at *3 (D. Mass. Aug. 17, 2020) (citing Stefanoff v. Hays Cty., Tex., 154 F.3d 523, 527 (5th Cir. 1998); see

also Texas v. Johnson, 491 U.S. 397, 404 (1989) ("In deciding whether particular conduct possesses sufficient communicative elements to bring the First Amendment into play, we have asked whether an intent to convey a particularized message was present, and whether the likelihood was great that the message would be understood by those who viewed it.") (internal citation and quotations omitted).

The record is unilluminating in this regard. Instead, it indicates that the several (non-Muslim) detainees who were interviewed cited reasons different than Wright for refusing to eat. As indicated by the Climate Report, "[t]he consensus amongst the detainees are issues with recreational time, the heat, library access, and the current out of cell time." [Dkt. 179-16]. An email sent on the same day indicated the "concerns noted were tier time, shower time, library as well as heat." [Dkt. 163-4 at 13]. This is more like general disapproval with prison conditions rather than a "particularized message." Thus, in light of the various reasons given by the detainees of Block 4 for refusing to eat, the hunger strike cannot be understood to be protected activity that triggers the First Amendment.

### 2. Causality

Most crucially, Wright has not established causality. Wright has not pointed to any evidence suggesting that the adverse action "would not have been taken 'but for' the alleged improper reason[.]" L'Heureux, 125 F.3d at 841. There are two significant reasons that underscore the lack of causality. First, Plaintiff's own actions contributed to his delay in

14

receiving his halal meals.  Second, the individual Defendants were not aware of Plaintiff's request for halal meals.

### 1.  Wright's Own Delay

First, the LPU Orientation Manual states, "An inmate whose religion places restrictions on his diet shall be permitted access to a special diet.  Requests for such diets must be made pursuant to 103 CMR 471, Religious Programs and Services." [3]  [Dkt. 179-19 at 5].  The regulation states what needs to be completed, where to find the form, and where to submit it.  Wright does not dispute that he was told by an officer that he needed to request halal meals from the Director of Treatment.  Wright could have received his halal meals sooner had he adhered to the process described in 103 CMR 471.08 earlier.  See Ramirez v. Collier, 595 U.S. 411, 435 (2022). ("Respondents can hardly complain about the inequities of delay when their own actions were a significant contributing factor.").

### 2.  Individual Defendants Lacked Notice

Second, as Wright sued the Defendants in their individual capacities, their liability "must be gauged in terms of their own actions."  Rogan, 175 F.3d at 77.  Wright has failed to do so.  Regarding DeMoura and Hockert-Lotz, Wright admitted in his deposition that the first time he had a conversation with them was when he was in the LPU.  Wright indicated in his deposition that he never spoke with DuBois.  In fact, he only corresponded with him via letters.  [Dkt. 163-1 at 17].  Wright would have needed to make the link between his refusal to eat non-halal meals and his placement in the LPU by the Defendants.  At most, Wright suggests DeMoura had the authority to place him in the LPU.  This, however, is not enough for a retaliation claim that alleges he was placed in the LPU by the individual Defendants *because* he was participating in a

---

[3] Plaintiff presumably received this manual.  The introduction of the manual indicates that each detainee receives a copy of the manual during orientation.

protected activity.  There is insufficient evidence for a jury to conclude the individual

Defendants had notice of his request for halal meals.  There is no evidence that the individual

Defendants were at the intake or initial medical evaluation; no evidence that the individual

Defendants received the informal grievances; and no evidence that the individual Defendants

were included on any requests, emails, or communications regarding his previous halal meals or

his halal diet request after the halal meals were discontinued.  Absent evidence to the contrary,

Wright has not made the requisite showing that the individual Defendants had actual notice of

Wright's requests for halal meals.  See Snell v. Neville, 998 F.3d 474, 490 (1st Cir. 2021)

(holding that conclusory statements without support in the record are not enough to survive

summary judgment).

The First Circuit has held that "[t]he mere chronology alleged in the complaint, while

sufficient to withstand a motion to dismiss, cannot get plaintiff to the jury once defendants have

produced evidence of a legitimate reason."  Layne v. Vinzant, 657 F.2d 468, 476 (1st Cir. 1981).

It is possible Wright had his own reason for refusing to eat.  Given what was revealed during the

Block 4 interviews and given what was shared about Wright's influential role in previous

facilities, it is reasonable for prison officials to have believed a collective hunger strike was

occurring and that Wright was a leader in the strike.  [See Dkt. 179-12].  Prison facilities "have

wide latitude in the control and discipline of inmates."  Price, 464 F. Supp. 2d at 96; see also

Hannon v. Beard, 645 F.3d 45, 48 (1st Cir. 2011) ("We appreciate that running a prison system is

a difficult enterprise, fraught with security concerns. Given that reality, courts must defer broadly

to correctional officials' managerial decisions.").  Here, MCI-CJ implemented a protocol it had in

place to address the hunger strike that impacted a significant number of detainees at the prison.

Even if Wright was not the inciter of the hunger strike, that fact alone would not be enough to

sustain a violation under the First Amendment.  See Lakram v. Coughlin, 99 F.3d 402 (2d Cir.

1995) ("[A] mistake is insufficient to support a claim of retaliation."); see also Strope v.

Cummings, 381 F. App'x 878, 883 (10th Cir. 2010) ("A[n] isolated mistake is also not an

actionable basis for a Free Exercise claim.").  In other words, whether Wright was an inciter is

not a material fact that would affect the outcome of this case.

Wright labors to shape his First Amendment claim within the mold of precedent.  He has

failed to provide a sturdy factual record to support a reasonable inference of retaliatory motive.

Thus, summary judgment is appropriate on this claim.

### C.    Due Process under the Fourteenth Amendment

A state may not deprive a prisoner of life, liberty, or property without due process of law.

U.S. Const. amend. XIV § 1.  The Supreme Court has long recognized that the Due Process

Clause contains both substantive and procedural components.  See Meyer v. Nebraska, 262 U.S.

390, 399 (1923) ("Without doubt, [liberty] denotes not merely freedom from bodily restraint but

also the right of the individual . . . to acquire useful knowledge, to marry, establish a home and

bring up children, to worship God according to the dictates of his own conscience. . . .");

Zinermon v. Burch, 494 U.S. 113, 125 (1990) ("The Due Process Clause also encompasses . . . a

guarantee of fair procedure.").  This case concerns only the latter component.[4]

To succeed on a procedural due process claim, Plaintiff must demonstrate he: 1) has been

deprived of a protected liberty interest and 2) that deprivation was accomplished without due

process of law.  See Perry v. Spencer, 94 F.4th 136, 147 (1st Cir. 2024) (en banc).  A cognizable

---

[4] The Court notes that, although Wright contends only that Defendants violated his *procedural* due process rights, Defendants nonetheless argue that they did not violate Wright's procedural or *substantive* due process rights.  [See Dkt. 163 at 19].  Moreover, Defendants' style their procedural due process argument as rebutting a claim Wright does not make.  [See id. at 12 (labeling procedural due process section "Fourteenth Amendment Equal Protection Clause.")].

"liberty interest may arise from the Constitution itself, by reason of guarantees implicit in the word 'liberty,' or it may arise from an expectation or interest created by state laws or policies." Wilkinson v. Austin, 545 U.S. 209, 221 (2005) (citations omitted). Wright has no constitutional liberty interest "in avoiding transfer to more adverse conditions of confinement[,]" and therefore must rest his case upon "an expectation or interest created by state laws or polices," Wilkinson, 545 U.S. at 221; see Perry, 94 F.4th at 147 ("[T]he use of segregated confinement in some circumstances implicates [state created] liberty interest[s]."). The Supreme Court has recognized a state-created liberty interest when, in relation to a "state['s] laws or polices," Wilkinson, 545 U.S. at 221, discipline imposes an "atypical and significant hardship on the inmate in relation to the ordinary incidences of prison life[,]" Sandin v. Conner, 515 U.S. 472, 484 (1995).

Here, Wright argues his 12-days in the LPU, combined with the Defendants' failure to proffer a timely response to his grievances, constitutes a deprivation of his liberty, for which he was entitled to certain procedural protections. [Dkt. 177 at 8]. Specifically, Wright claims he was entitled to "notice of the factual basis for [his] confinement" and "an opportunity to present [his] views to the official charged with the decision to confine [him]." [Id.] (internal citations and quotations omitted]. The First Circuit, sitting en banc, recently articulated a standard for determining "[u]nder what circumstances" a "particular form of segregation[,] given its nature, duration, or the combination of its nature and duration[,]" Perry v. Spencer, 94 F.4th 136, 153 (1st Cir. 2024) (en banc), represents an "atypical and significant hardship on [an] inmate. . . ." Sandin, 515 U.S. at 484.

Perry establishes four theories for a detainee to prove that his or her placement in solitary confinement implicates a constitutionally protected liberty interest. 54 F.4th at 154-57. First, if

"the solitary confinement that grounds an inmate's procedural due process claim exceeds thirty days, that confinement will constitute an 'atypical and significant hardship' . . . if, in relation to the reason for that confinement, it is '[ir]rational,' '[in]essential,' or 'excessive' in duration." Id. at 154 (quoting Skinner v. Cunningham, 430 F.3d 483, 487 (1st Cir. 2005)). Second, if an "inmate can show that 'few' members of the general prison population have experienced similar durations of" solitary confinement, she or he will succeed at establishing a constitutionally protected liberty interest. Id.[5] Third, in the absence of an "empirical showing as to the frequency with which the prison system at issue imposes solitary confinement of comparable length" a detainee may create a rebuttable presumption of an "atypical and significant hardship based on [a confinement's] prolonged nature" alone. Id. at 154-155.[6] Lastly, "when the challenged confinement is longer than thirty days[]" an inmate "may rely on the state prison system's regulations supportably to show that the solitary confinement at issue is atypical due to its length alone[.]" Id. at 157.

Wright's procedural due process claim fails under all four Perry theories. In other words, the Court does not find that Wright was deprived of a protected liberty interest. As an initial matter, Wright was only confined in LPU for 12 days [see Dkt. 178 ¶ 35], making the first and last theory facially inapplicable to him. See Perry, 94 F.4th at 154. As to the second, Wright has

---

[5] The First Circuit declined to "identify a minimum length of confinement to which a plaintiff must have been subjected" before a liberty interest is implicated. Perry, 54 F.4th at 154. The Perry Court cited several cases where the length of solitary confinement, when compared to the 'normal' length of confinement, was sufficient to infringe upon an inmate's liberty interest. Id. (citing Shoats v. Horn, 213 F.3d 140, 144 (3rd Cir. 2000) (eight years); Jones v. Baker, 155 F.3d 810, 815 (6th Cir. 1998) (Gilmin, J., concurring) (two-and-a-half years); Lee v, Coughlin, 26 F. Supp. 2d 615, 635 (S.D.N.Y. 1998) (376 days).

[6] Again, declining to adopt a general baseline, Perry instead pointed to two out-of-circuit cases finding a liberty interest in "prolonged" confinement. 94 F.4th at 154-55. In Colon v. Howard, the Second Circuit found a 305 day stay in solitary confinement to be of sufficient length, without comparative evidence, to implicate the Due Process Clause. 215 F.3d 227, 231 (2nd. Cir. 2000). And in Harris v. Caruso, the Sixth Circuit determined, without reference to empirical evidence, that eight years of administrative segregation triggered an inmate's liberty interest. 465 Fed. App'x 481, 484 (6th Cir. 2012) (unreported case).

provided no evidence indicating that his 12-day stay in the LPU was an "atypical and significant hardship" compared to other inmates at MCI-CJ.  <u>Sandin</u>, 515 U.S. at 484; <u>Perry</u>, 94 F.4th at 154.  Indeed, without comparator evidence demonstrating that "few members of the general prison population have experienced similar durations of" time in LPU, <u>Perry</u>, 94 F.4th at 154, Wright cannot establish 12 days in LPU was either "atypical" for a Massachusetts prison facility or constituted a "significant hardship" compared to "the ordinary incidents of prison life." <u>Sandin</u>, 515 U.S. at 484.  Finally, without an "empirical showing as to the frequency with which" MCI-CJ "imposes solitary confinement" Wright must rely on the "prolonged nature" of his confinement alone.  <u>Perry</u>, 94 F.4th at 155.  Twelve days in the LPU is not, on its own, sufficient to trigger Wright's liberty interest.  <u>See supra</u>, note 5.

Wright's Due Process claim, therefore, fails as a matter of law.  He claims that by ignoring his "multiple letters and informal grievance[s] seeking to be heard on his placement . . . in the LPU[,]" Defendants "failed to provide [him] due process."  But, as explained above, his placement in the LPU did not implicate a constitutionally protected liberty interest and therefore he was not entitled to the processes he sought.  <u>See</u> <u>Wilkinson v. Austin</u>, 545 U.S. 209, 221 (2005) ("[T]hose who seek to invoke [the Due Process Clause's] procedural protection must establish that [life, liberty or property] is at stake.").

### D.  Additional Defenses

To cinch matters, the Court will briefly discuss additional theories Defendants have raised.  This Court could have started – and stopped – its analysis with Defendants' failure to exhaust defense.  The Court takes the opportunity to discuss the merits of the case to give the Plaintiff a more thorough legal analysis of the case.  The Court applauds Plaintiff on his zealous

self-advocacy. Although it cannot grant him the relief he requested, it can provide him a careful explanation of the law.

The Prison Litigation Reform Act ("PLRA") requires an incarcerated person bringing a civil action challenging "prison conditions under [42 U.S.C. § 1983], or any other Federal law" to first exhaust "such administrative remedies as are available [to them]." 42 U.S.C. § 1997e(a); see Jones v. Bock, 549 U.S. 199, 211 (2007) ("There is no question that exhaustion is mandatory under the PLRA and that unexhausted claims cannot be brought in court."). However, because the "failure to exhaust is an affirmative defense under the PLRA . . . inmates are not required to specially plead or demonstrate exhaustion in their complaints." Jones, 549 U.S. at 216. Thus, failure to exhaust "must be raised and proved by the defense." Cruz Berrios v. Gonzalez-Rosario, 630 F.3d 7, 11 (1st. Cir. 2010).

If the defendant can prove a detainee did not "proper[ly] exhaust [her] administrative remedies[,]" before filing a lawsuit, the court must dismiss the case. Woodford v. Ngo, 548 U.S. 81, 90 (2006); see 42 U.S.C. § 1997e(a) ("No action shall be brought . . . until such administrative remedies as are available are exhausted."). To prevail on an exhaustion defense "the defendant must prove that: (1) administrative remedies were in fact available to the plaintiff, and (2) the plaintiff failed to exhaust them." Cruz-Berrios v. Oliver-Baez, 792 F. Supp. 2d 224, 228 (D.P.R. 2011) (citing Gonzalez-Rosario, 630 F.3d at 11). The one exception to exhaustion under the PLRA is that the administrative remedy must be available. See Johnson v. Thyng, 369 F. App'x 144, 147-48 (1st Cir. 2010).

Defendants have met their burden of demonstrating that Wright has failed to exhaust his administrative remedies before filing his claims against them in this Court. Wright does not dispute that he has not exhausted his remedies. Rather, he argues that the Defendants "through

machination, intimidation and other means (i.e. spoliation) have left the administrative remedy process effectively unavailable." (internal quotations omitted). These conclusory statements cannot carry the day, especially when Wright had little to no contact with the Defendants directly.

Having concluded that no constitutional violation occurred, this Court need not address the additional defense of qualified immunity. See Flowers v. Fiore, 359 F.3d 24, 34 (1st Cir. 2004). There's one loose end. Defendants also argue that the PLRA bars recovery for damages where plaintiffs have not alleged a physical injury. As this is a split issue among the circuits, this Court will refrain from ruling on it as it has no bearing on the case. See Cryer v. Spencer, 934 F. Supp. 2d 323, 336-38 (D. Mass. 2013) (noting both the deep divide between the circuits, and the absence of an answer from the First Circuit).

## V.    CONCLUSION

This Court gives credit where credit is due. Plaintiff delivered a well-pleaded offensive in an attempt to convince this Court of his alleged wrongs. While this Court remains unconvinced, it does not doubt the sincerity of Plaintiff's sense of deprivation. But that deprivation, if deprivation it be, is not tantamount to a First or Fourteenth Amendment claim. Thus, for the foregoing reasons, Defendants' Motion for Summary Judgment is **GRANTED** [Dkt. 162]. This case is dismissed.

      **SO ORDERED**.

Dated: March 27, 2025                /s/ Angel Kelley
                                     Hon. Angel Kelley
                                     United States District Judge